William N. Lawton
Eubanks & Associates, PLLC
1331 H Street NW, Suite 902
Washington, D.C. 20005
DC Bar No. 1046604 (admitted *pro hac vice*)
nick@eubankslegal.com
(202) 556-1243

William S. Eubanks II
Eubanks & Associates, PLLC
1331 H Street NW, Suite 902
Washington, D.C. 20005
DC Bar No. 987036 (admitted *pro hac vice*)
bill@eubankslegal.com
(970) 703-6060

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Center for Biological Diversity; and Maricopa Audubon Society,<br><br>Plaintiffs,<br><br>v.<br><br>Anthony (Scott) Feldhausen, BLM Gila District Manager; Raymond Suazo, BLM Arizona State Director; Tracy Stone-Manning, Director, BLM<br><br>Defendants. | No. CV-21-409-TUC-DCB<br><br>**AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

## INTRODUCTION

1.     This case challenges the United States Bureau of Land Management's ("BLM") violations of the Endangered Species Act's ("ESA") mandate to utilize its authorities under federal law to conserve endangered species. In particular, this case challenges BLM's failure to utilize its authorities, including its authority as the manager of the San Pedro Riparian National

Conservation Area ("SPRNCA"), to conserve the Huachuca water umbel (*Lilaeopsis shaffneriana* ssp. *recurva*) ("Umbel" or "the Umbel"), a highly endangered plant species.

2.     In addition to mandating in the ESA that agencies must use their authorities to conserve endangered species, Congress also directed that BLM "shall manage [the SPRNCA] in a manner that conserves, protects, and enhances" its natural resources, which include the endangered Umbel. 16 U.S.C. § 460xx-1(a). The SPRNCA is home to the largest remaining population of the highly imperiled Umbel and the majority of its designated critical habitat, which, under the ESA, are lands deemed "essential to the conservation of the species" and "which may require special management considerations or protection." *Id.* § 1532(5)(A)(i). However, the SPRNCA—including the Umbel's critical habitat—is regularly subject to depredations by trespass cattle, which enter the area through a dilapidated boundary fence that BLM has failed to maintain in working order. Because BLM fails to conserve the Umbel by protecting the species and its habitat from trespass cattle, which is a significant threat to the survival and recovery of the species, BLM is in ongoing violation of the ESA.

3.     Trespass cattle in the SPRNCA pose an existential threat to the Umbel. The United States Fish & Wildlife Service ("FWS") listed the Umbel as an endangered species in 1997 due in significant part to habitat destruction from livestock grazing. 62 Fed. Reg. 665 (Jan. 6, 1997). In 1999, FWS designated critical habitat for the Umbel, roughly two-thirds of which occurs within the SPRNCA. In doing so, the Umbel's profound peril led FWS to explain that threats such as "livestock overgrazing" that "may destroy or adversely modify critical habitat" "will also likely jeopardize the continued existence of the species." 64 Fed. Reg. 37449, 37445 (July 12, 1999). More recently, FWS issued a Recovery Plan for the Umbel explaining that "the most significant long-term threats to the continued existence of the species" include "poorly managed livestock grazing." Hence, FWS has left no room to doubt that trespass cattle in the SPRNCA, where most of the Umbel's critical habitat and many of the remaining occurrences of the species are located, present a dire threat to the species' survival and recovery.

4.     Trespass cattle pose a serious obstacle to the Umbel's recovery. As FWS explained in its Recovery Plan for the Umbel, for the species to recover, it is necessary to

remove "stressors" from "poorly managed livestock grazing" in order "to prevent a significant decline . . . or some other significant negative impact short of extinction." In particular, FWS specified that such actions include "[p]rotect[ing] occupied habitats from congregating livestock . . . especially during dry periods," and further requires "checking and maintaining . . . pasture and exclosure fences . . . and enforcing trespass cattle removal if necessary." More specifically, with reference to livestock exclosures within the SPRNCA, FWS explained that "it is important to monitor and remove trespass livestock" to allow the Umbel a chance to recover.

5.      Yet, trespass cattle are a common occurrence in the SPRNCA. Although livestock grazing is not formally permitted in the SPRNCA except in four BLM-authorized grazing allotments, cattle frequently enter portions of the SPRNCA where they are not permitted and cause significant environmental damage as they concentrate in vulnerable riparian areas— including critical habitat occupied by the highly endangered Umbel. Trespass cattle are able to enter the SPRNCA because, among other failings, BLM has not adequately maintained a boundary fence. As recently as July 2021, Plaintiffs documented extensive damage from trespass cattle in occupied Umbel critical habitat and notified BLM of this issue in a notice of intent to file this lawsuit. However, BLM has not provided any response to that notice letter or any explanation of how it intends to protect and conserve the Umbel. Plaintiffs visited the SPRNCA again in September 2021, again observed signs of trespass cattle, and observed and documented widespread fencing in disrepair in the area where the highest concentrations of endangered Umbel have been located in past surveys. This indicates that BLM has in fact not corrected this significant problem.

6.      In the ESA, Congress established the policy that "all Federal departments and agencies shall seek to conserve endangered species and threatened species and shall utilize their authorities" to that end, 16 U.S.C. § 1531, and mandated that agencies must "utilize their authorities in furtherance of the purposes of [the ESA] by carrying out programs for the conservation of endangered species," *id.* § 1536(a)(1). Congress defined "conserve" and "conservation" in the ESA as "to use and the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the

measures provided pursuant to this chapter are no longer necessary." *Id.* § 1532(3). In the SPRNCA, common-sense measures are presently available to BLM to conserve the Umbel by protecting it from the significant threat of trespass livestock in the heart of its remaining habitat (including critical habitat) on the SPRNCA. However, BLM has no program, or even any coherent plan, to utilize its authorities to protect the Umbel from trespass cattle or to recover the species from the brink of extinction. BLM's failure to utilize its authorities to address this major threat to Umbel conservation violates the ESA.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 16 U.S.C. § 1540(g).

8.      Venue is proper in this Court under 28 U.S.C. § 1391(e) because BLM has offices in this district, because Plaintiff Center for Biological Diversity has its headquarters in Tucson which is in this this District and Division, and because a substantial part of the events or omissions giving rise to this claim occurred in this District and Division.

## PARTIES

9.      Plaintiff Center for Biological Diversity ("the Center") is a non-profit 501(c)(3) corporation headquartered in Tucson, Arizona, with offices in a number of states and Mexico. The Center works through science, law, and policy to secure a future for all species, great or small, hovering on the brink of extinction. The Center is actively involved in species and habitat protection issues throughout the United States and the world, including protection of plant and animal species from the impacts of global warming. The Center has more than 81,800 members and more than 1.7 million supporters throughout the United States and the world. The Center brings this action on its own institutional behalf and on behalf of its staff and its members, many of whom regularly enjoy and will continue to enjoy educational, recreational, and scientific activities concerning the Huachuca water umbel and its habitat in the SPRNCA, including critical habitat, harmed by BLM's legal violations challenged in this case. The interests of the Center in the protection of the Umbel extend over decades. For example, members of the Center including co-founder Dr. Robin Silver petitioned the FWS to list the Umbel as endangered on

May 31, 1993. That petition resulted in listing of the Umbel as endangered and the designation of its critical habitat. Since that time, the Center and its members, including but not limited to Dr. Silver, have continued to study and observe the Umbel and document the perils to the species, including through extensive complaints to BLM regarding harms from trespass cattle, as described below. The interests of the Center and its members in observing, studying, and otherwise enjoying the Umbel and its habitat have been harmed by Defendants' legal violations and will continue to be harmed by the diminished occurrences of Umbels in the SPRNCA and the degradation of its habitat.

10.     Plaintiff Maricopa Audubon Society ("Maricopa Audubon") is a non-profit organization dedicated to the enjoyment of riparian wildlife and plant species with a primary focus on the protection and restoration of southwestern riparian habitat through fellowship, education, and community involvement. Maricopa Audubon is a chapter of the National Audubon Society. Maricopa Audubon has over 2,300 members, primarily in central Arizona, including Dr. Silver, who also works on its board. Maricopa Audubon has undertaken ongoing efforts to protect habitats for imperiled species throughout the arid Southwest. Maricopa Audubon has played a strong role in protecting endangered and threatened species in the Southwest through public education efforts, field surveys, public field trips, and position papers. Maricopa Audubon has been intimately involved in San Pedro River preservation efforts since the mid-1970s. For example, Maricopa Audubon led the efforts to stop the planned Charleston Dam which would have inundated the entire area. In addition, Maricopa Audubon conducts field trips with members of the organization and non-members from the general public to critical habitat areas of species listed under the ESA, including the Umbel. MAS brings this action on behalf of itself and its adversely affected members. Accordingly, the educational, scientific, aesthetic, conservation, and recreational interests of MAS's members have been and are being harmed, and unless the Court grants the requested relief, will continue to be adversely affected and irreparably injured by Defendants' failures to comply with the law.

11.     Defendant Anthony (Scott) Feldhausen is the BLM Gila District Manager, in which capacity Mr. Feldhausen has management and supervisory authority over the management

of the SPRNCA, including the responsibility to ensure that BLM's management of the SPRNCA complies with the ESA. Defendant Feldhausen is sued solely in his official capacity.

12.     Defendant Raymond Suazo is the BLM Arizona State Director, in which capacity Mr. Suazo has management and supervisory authority over the agency's operations in this state, including BLM's management of the SPRNCA. Mr. Suazo also has the responsibility to ensure that BLM's activities and land management in Arizona complies with the ESA. Defendant Suazo is sued solely in his official capacity.

13.     Defendant Tracy Stone-Manning is the Director of BLM, which is an agency or instrumentality of the United States within the Department of Interior. Director Stone-Manning is responsible for overseeing BLM's management of various public lands and waters, including the lands and waters of the SPRNCA, and has the responsibility to ensure that the agency's management of public lands and resources complies with the ESA. Defendant Stone-Manning is sued solely in her official capacity.

## STATUTORY AND REGULATORY FRAMEWORK

### I.     The Endangered Species Act

14.     Recognizing that certain species of plants and animals "have been so depleted in numbers that they are in danger of or threatened with extinction," Congress enacted the ESA to provide both "a means whereby the ecosystems upon which endangered and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531. The ESA reflects "an explicit congressional decision to afford first priority to the declared national policy of saving endangered species." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 185 (1978). The ESA "represent[s] the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Id*. at 180.

15.     Under the ESA, a species may be listed as endangered or threatened. An endangered species—a status which is reserved for species in the most perilous condition—is one that is "in danger of extinction throughout all or a significant portion of its range . . . ." 16 U.S.C. § 1532(6).

16.     The ESA mandates that when a species is listed as endangered or threatened, "[t]he Secretary . . . shall . . . designate any habitat of such species which is then considered to be critical habitat." 16 U.S.C. § 1533(a)(3)(A). The "Secretary" is defined in the context of plant species such as the Umbel to be "the Secretary of the Interior," *id.* § 1532(15), who has delegated her/his authority to administer the ESA to FWS by regulation, 50 C.F.R. § 402.01(b). The ESA defines "critical habitat" to include "the specific areas within the geographic area occupied by the species, at the time it is listed . . . on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection." *Id.* § 1532(5)(A)(i). Prior to 2016, the ESA's implementing regulations utilized the term "primary constituent elements" to describe the physical or biological features of critical habitat units that are essential to the conservation of listed species. *See* 81 Fed. Reg. 7414, 7426 (Feb. 11, 2016) (explaining the removal of the term "primary constituent elements" from the regulations). The term "primary constituent elements" is used in critical habitat designations and related agency findings from before 2016, such as the designation of the Umbel's critical habitat. *See* 64 Fed. Reg. 37441, 37444 (July 12, 1999) (describing the "physical and biological features that are essential to the conservation of" the Umbel in terms of four "primary constituent elements").

17.     The ESA reflects "the policy of Congress that all Federal departments and agencies shall seek to conserve endangered species and threatened species and shall utilize their authorities in furtherance of the purposes of this chapter." 16 U.S.C. § 1531(c)(1). Congress specifically defined the terms "conserve, conserving, and conservation" as "to use and the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary." *Id.* § 1532(3). Accordingly, the policy embodied by the ESA is that Federal agencies must use their authorities to help endangered species and threatened species recover to the point that their listing under the ESA is no longer necessary.

18.     Section 7(a)(2) of the ESA requires federal agencies to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued

7

existence of any endangered species." 16 U.S.C. § 1536(a)(2). To carry out this obligation, before undertaking any action that may have direct or indirect effects on listed species, an action agency must engage in consultation with the FWS in order to evaluate the impact of the proposed action. *See id.* § 1536(a). For any "action," which means "all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies," 50 C.F.R. § 402.02, "in which there is discretionary federal involvement or control," *id.* § 402.03, that may adversely affect listed species, agencies are required to engage in formal consultation, *id.* § 402.11. During such consultation, agencies must provide FWS with a "biological assessment" that identifies any listed species likely to be affected by the agency's action. 16 U.S.C. § 1536(c). Formal consultation concludes with FWS producing a Biological Opinion which explains, based on the best available scientific information, whether the action is likely to jeopardize the continued existence of a listed species or destroy or adversely modify designated critical habitat.

19.     In section 7(a)(1) of the ESA, Congress imposed a legally distinct, affirmative duty on all Federal agencies to utilize their authorities to conserve endangered species. Section 7(a)(1) mandates that "[t]he Secretary shall review other programs administered by him and utilize such programs in furtherance of the purposes of this chapter," and that "[a]ll other Federal agencies shall, in consultation with and with the assistance of the Secretary, utilize their authorities in furtherance of the purposes of this chapter by carrying out programs for the conservation of endangered species and threatened species . . . ." 16 U.S.C. § 1536(a)(1).

20.     The ESA's implementing regulations specify that "Section 7(a)(1) of the Act directs Federal agencies, in consultation with and with the assistance of the Secretary of the Interior or Commerce, as appropriate, to utilize their authorities to further the purposes of the Act by carrying out conservation programs for listed species." 50 C.F.R. § 402.01(a). "Such affirmative conservation programs must comply with applicable permit requirements . . . for listed species and should be coordinated with the appropriate Secretary." *Id.*

21.     BLM's Special Species Management Manual, Manual 6840, "establishes policy for management of species listed or proposed for listing pursuant to the [ESA] . . . which are found on BLM-administered lands." Manual 6840 specifies that State Directors, such as

Defendant Suazo, "are responsible for . . . [d]eveloping and implementing procedures for the conservation of special status species on BLM-administered lands within their States." Likewise, State Directors are responsible for "[e]nsuring that when BLM engages in the planning process, land use plans and subsequent implementation-level plans identify appropriate outcomes, strategies, restoration opportunities, use restrictions, and management actions necessary to conserve and/or recover listed species" and that "such plans should address any approved recovery plans and conservation agreements."

22.     Manual 6840 also states that "BLM shall conserve federally listed species by fulfilling the requirements of the ESA . . . ." The Manual further provides that "BLM shall conserve listed species through the administration of the various sections of the ESA that apply to Federal agencies," and that "[w]hen administering the ESA, the BLM shall use the best scientific and commercial data available." The Manual also states that "BLM shall, consistent with Section 2 of the ESA, seek to conserve endangered and threatened species and shall utilize its authorities in furtherance of the purposes of the ESA."

23.     BLM's Manual 6840 further specifies the agency's responsibilities for implementing recovery plans prepared by FWS. The Manual states that "BLM will incorporate objectives and actions identified in recovery plans into BLM documents, as appropriate," including in "land use plans, implementation level plans, and species conservation plans or agreements."

24.     With regard to section 7(a)(1) of the ESA, BLM's Manual recognizes that "Section 7(a)(1) requires the BLM to use its authorities to further the purposes of the ESA by implementing programs for the conservation of threatened and endangered species and the ecosystems upon which they depend." The Manual further specifies that "BLM can carry out these responsibilities" through: "[d]eveloping and implementing activities that provide for the conservation and recovery of species listed pursuant to the ESA"; "[u]ndertaking actions designed to maintain the integrity of the primary constituent elements of federally designated critical habitat on BLM-administered lands"; "[e]nsuring that BLM actions are not likely to jeopardize the continued existence of any endangered species or threatened species or destroy or

adversely modify designated critical habitat"; and "[i]mplementing conservation recommendations included in biological opinions if they are consistent with relevant law and policy and are technologically and economically feasible."

**II.     Legislation Creating the SPRNCA**

25.     Congress created the SPRNCA in 1988 "[i]n order to protect the riparian area and the aquatic, wildlife, archeological, paleontological, scientific, cultural, educational, and recreational resources of the public lands surrounding the San Pedro River in Cochise County, Arizona." 16 U.S.C. § 460xx(a).

26.     Congress directed that BLM "shall manage the conservation area in a manner that conserves, protects, and enhances the riparian area and the aquatic, wildlife, archeological, paleontological, scientific, cultural, educational, and recreational resources of the conservation area." 16 U.S.C. § 460xx-1(a).

27.     Congress specifically prohibited BLM from allowing uses of the SPRNCA that do not conserve, protect, and enhance the SPRNCA's natural and cultural resources. Thus, Congress mandated that BLM "shall only allow such uses of the conservation area as [it] finds will further the primary purposes for which the conservation area is established." 16 U.S.C. § 460xx-1(b). Likewise, Congress withdrew "all Federal lands within the conservation area . . . from all forms of entry . . . under the public land laws." *Id.* § 460xx-1(c).

28.     Congress provided a penalty of "a fine of up to $10,000, or imprisonment for up to one year, or both" for "[a]ny person who violates any provision" of the law establishing the SPRNCA. 16 U.S.C. § 460xx-1(e).

29.     In establishing the SPRNCA, Congress stressed the unique and valuable nature of the environmental resources found in this area. For example, the House Committee on Interior and Insular Affairs stated that although numerous "factors have combined to greatly degrade the value of many of the west's riparian areas for wildlife habitat . . . [t]he San Pedro River is a fortunate exception" because it "represents a uniquely long stretch of desert riparian habitat in good condition, as well as other significant resources which greatly enhance its importance as a public resource." H.R. Rep. No. 99-773 at 3 (1986). The House Committee recognized that

"[t]he area is frequented by an outstanding diversity of wildlife, including more than 260 bird species," and that it includes highly valuable archaeological, cultural, and paleontological resources. *Id.* Likewise, in supporting the SPRNCA's creation, Senator John McCain noted that the area includes "a long stretch of desert riparian habitat that cannot be found anywhere else in the country." 134 Cong. Rec. 30275, 30280 (Oct. 13, 1988).

30.     In creating the SPRNCA, Congress explained that the "key provisions" of its statutory creation "require the Secretary to manage this conservation area to protect its riparian area and the natural resources associated with it, including wildlife and wildlife habitat." H.R. Rep. No. 99-773 at 4. Likewise, Congress explained that its "mandate is intended to be as protective as possible of the natural and cultural resources" of the SPRNCA because it "provides that the Secretary may only allow such uses of the conservation area as will *further* the primary purposes of the bill—which are . . . to protect the conservation area and its resources." *Id.* (emphasis in original); *see also* 134 Cong. Rec. at 30276 ("Specific provisions have been included in the legislation restricting use so that the delicate riparian resources will not be harmed in any way.").

31.     In creating the SPRNCA, Congress specifically recognized the threats to the area from livestock grazing. For example, the House Committee Report recognized that "[l]ivestock grazing is a use with particular impact on riparian areas, because of the natural tendency of cattle to concentrate by available water and shade in the hot and arid southwest." H.R. Rep. No. 99-773 at 5. The Report also recognized that "[i]f they are allowed to concentrate, livestock may fail to utilize forage over a large area and instead overgraze the immediate riparian area, with severe impacts on riparian vegetation and cover." *Id.*

**III.     Law and Regulations Governing Livestock Grazing and Trespass Cattle**

32.     Arizona is an "open range" or "fence out" state, where the responsibility for keeping cattle off one's property is the responsibility of the landowner, not that of neighboring ranchers. *See, e.g.*, AZ Rev. Stat. § 3-1427 (2020) ("An owner or occupant of land is not entitled to recover for damage resulting from the trespass of animals unless the land is enclosed within a lawful fence . . . ."); *see also id.* § 3-1426 (defining a "lawful fence"). Accordingly, the ordinary

11

duty of a landowner in Arizona who wishes to protect plants on his/her property is to build and

maintain a fence in working order to exclude cattle. Although BLM is not legally bound by

Arizona's open range laws, *see U.S. v. Shenise*, 43 F. Supp. 2d 1190, 1196 (D. Colo. 1999), the

effect of the open range laws is that livestock owners do not generally build fences to enclose

their animals, which makes fencing to exclude animals essential as a practical matter.

33.     BLM's regulations regarding "fundamentals of rangeland health" obligate the

agency to manage public lands for the conservation of ESA-listed species. For example, BLM's

regulations specify that the "fundamentals of rangeland health" include the requirement that

"[h]abitats are, or are making significant progress toward being, restored or maintained for

Federal threatened and endangered species . . . ." 43 C.F.R. § 4180.1(d).

34.     BLM's regulations governing "[s]tandards and guidelines for grazing

administration" also obligate the agency to conserve ESA-listed species. For example, BLM's

regulations state that any "state and regional standards . . . must address . . . [h]abitat for

endangered, threatened, proposed, candidate, and other special status species." 43 C.F.R. §

4180.2(d). Likewise, "[a]t a minimum, State or regional guidelines . . . must address . . .

[r]estoring, maintaining, or enhancing habitats to assist in the recovery of Federal threatened and

endangered species." *Id.* § 4180.2(e).

35.     Notwithstanding these regulatory requirements, the "Arizona Standards for

Rangeland Health and Guidelines for Grazing Administration," which were signed by the

Secretary of Interior in 1997 and on information and belief have not been updated since that

time, merely state that "[c]onservation of Federal threatened or endangered, proposed, candidate,

and other special status species is promoted by the maintenance or restoration of their habitats."

The Arizona standards contain no specific guidance for how to promote the conservation of the

Umbel (or any other endangered or threatened species).

36.     BLM's regulations authorize the agency to seek "civil and criminal penalties" for

unauthorized grazing. 43 C.F.R. § 4140.1(b). Violations include "[a]llowing livestock or other

privately owned or controlled animals to graze" on public lands "[w]ithout a permit or lease or

other grazing use authorization" or "[i]n violation of the terms and conditions of a permit, lease,

or other grazing use authorization." *Id.* § 4140.1(b)(1). BLM can seek penalties from trespass grazers including the value of "forage consumed," compensation for "injury to Federal property caused by their unauthorized grazing use," and "expenses incurred in impoundment and disposal of their livestock." *Id.* 4150.1(b). BLM can also enter into a "settlement" with a trespass grazer, *id.* § 4150.3, which generally requires the trespass grazer to pay "the value of forage consumed," but which can include a "nonmonetary settlement" for a "nonwillful" violation only if "[t]he public lands have not been damaged," *id.* § 4150.3(c). However, for any "willful" or "repeated willful" violation, BLM must seek "the full value for all damages to the public lands and other property of the United States," and "all reasonable expenses incurred by the United States in detecting, investigating, resolving violations, and livestock impoundment costs." *Id.* § 4150.3. For "willful" violations, the settlement must also include a payment of "[t]wice the value of forage consumed," *id.* § 4150.3(b), and for "repeated willful violations," the payment must be "[t]hree times the value of the forage consumed," *id.* § 4150.3(c). BLM can also impound and sell trespass cattle at auction after providing sufficient written notice of its intent to do so, and after providing the livestock owner an opportunity to "redeem" the livestock by paying all sums due to the United States. *Id.* §§ 4150.4-1 to 4150.4-5. BLM has the ability to seek penalties for trespass grazing even if it has not complied with a state open range law by maintaining a fence to exclude cattle. *See*, *e.g.*, *Shenise*, 43 F Supp. 2d at 1192, 1196, 1202 (finding a trespass grazer guilty despite the fact that BLM had not maintained a fence to exclude livestock from public lands).

## **FACTUAL BACKGROUND**

### I.    **The Huachuca Water Umbel**

37.    Endangered species represent the health of their native and required habitat.

38.    The Umbel is a small semiaquatic herbaceous perennial plant that ranges in height from a few inches to just over one foot. The Umbel is named for its umbrella-like flower structures which have three to ten tiny flowers with white and maroon coloration. Biologists use the term "occurrence" to describe concentrations of the Umbel because the plant can propagate

asexually, which can make it impracticable to identify individuals, especially since apparently separate leafing stalks may actually be connected underground by horizontal root systems.

39.    As FWS noted in its Recovery Plan for the species, the Umbel relies on "aquatic habitats such as cienegas [*sic*], rivers, streams, and springs of five watersheds in southeastern Arizona and adjacent portions of Sonora, Mexico." The species occurs in "perennial, shallow, and slow-flowing or quiet waters or in active stream sites containing refugial sites where most plants can escape the effects of scouring floods." Historically, such placid river systems were relatively common in Arizona, but extensive overgrazing by domestic livestock and habitat modifications by humans have rendered this type of river system extremely rare in the Southwest. As FWS has stated, "[f]or the last 150 years almost all of the drainages in southeastern Arizona have been drastically altered by anthropogenic change and, today most of these drainages consist of deeply incised channels that are disconnected from the former broad floodplains." Because the Umbel is adapted to the formerly common riparian system that is all-but-destroyed today, and is not well-suited to survive in the human-altered environment, the Umbel is now confined to the extremely few locations where its required habitat persists.

40.    FWS listed the Umbel as endangered in 1997. 62 Fed. Reg. 665, 665 (1997). The listing decision was based in part on "destruction of habitat resulting from livestock overgrazing," among other threats. *Id.* FWS issued a Recovery Plan for the Umbel in 2017, which noted that "[t]he decision to list the [Umbel] was based on the limited number of wetland habitats . . . and threats including the degradation and destruction of habitat resulting from poorly managed livestock grazing." Twenty years after the Umbel's listing, FWS's Recovery Plan found that "poorly managed livestock grazing" and "aquatic habitat degradation" are still among "the most significant long-term threats to the continued existence of the species."

41.    The Umbel's range has decreased dramatically since its first observation near the present site of Tucson, Arizona in 1881. Due to extensive overgrazing by domestic livestock and habitat modification associated with human population growth, the Umbel has lost the vast majority of the habitat where it once lived. As FWS stated in its Recovery Plan:

Habitat degradation over historical time has resulted in decreased number and size of [Umbel] occurrences, potentially decreasing genetic diversity, and making the taxon more vulnerable to extinction as a result of stochastic events. . . . For instance, the restriction of the [Umbel] to a relatively small area in southeastern Arizona and adjacent areas of Mexico increases the chance that a single environmental catastrophe, such as a severe tropical storm or drought, could eliminate appreciable numbers of occurrences.

42.     Today, the Umbel is known to occur only in 17 sites in the United States. The species has been extirpated from 8 of its former U.S. habitats, and "no occurrences have been relocated in recent years" in 6 more locations in the United States. (The Umbel has also been known to live on 21 sites in Mexico, but FWS noted that "most of these locations have not been revisited in recent years," and the species' status in Mexico is unknown.)

43.     Even where it is clinging to survival, the Umbel's fate is precarious. As FWS's Recovery Plan noted, "[t]here are no occurrences [of the Umbel] that appear to be increasing in size." Instead, known occurrences of the Umbel are stable at best or "in decline." Many occurrences "have not been relocated in recent years and are believed extirpated due to degradation and contraction of suitable habitat."

44.     The San Pedro River's riparian area—located mainly in the SPRNCA—contains by far the largest population of the Umbel and reflects over 40 percent of the species' current range, according to FWS's Recovery Plan. As the Recovery Plan also notes, "[o]f the three United States watersheds which support [the Umbel], the San Pedro supports the greatest amount." However, according to the most recent survey data cited in FWS's Recovery Plan, in the SPRNCA "most occurrences were sparsely populated" and were threatened by competitive exotic plants and erosion.

45.     FWS designated critical habitat for the Umbel in 1999. 64 Fed. Reg. 37,441, 37,441 (1999). "Designated habitat includes a total of 83.2 kilometers (km) (51.7 miles (mi)) of streams or rivers in Cochise and Santa Cruz counties, Arizona." *Id.* Approximately 33.7 miles—or roughly two-thirds—of the Umbel's designated critical habitat is located in the SPRNCA. *See id.* at 37,453 (depicting the critical habitat unit within the SPRNCA).

46.     The primary constituent elements of the Umbel's critical habitat, which reflect the "physical or biological features" that are "essential to the conservation of the species" and "which may require special management considerations or protection," 16 U.S.C. § 1532(5)(A), include: 1) sufficient perennial baseflows to provide a permanently or nearly permanently wetted substrate for growth and reproduction; 2) a stream channel that is relatively stable, but subject to periodic flooding that provides for rejuvenation of the riparian plant community and produces open microsites for the Umbel's expansion; 3) a riparian plant community that is relatively stable over time and in which non-native species do not exist or are at a density that has little or no adverse effect on resources available for the Umbel's growth and reproduction; and 4) in streams and rivers, refugial sites in each watershed and in each reach, including but not limited to springs or backwaters of mainstem rivers, that allow each occurrence to survive catastrophic floods and recolonize larger areas. 64 Fed. Reg. at 37,451.

47.     As FWS explained in designating critical habitat, "[a]ctivities that may destroy or adversely modify critical habitat include those that alter the primary constituent elements to the extent that the value of critical habitat for both the survival and recovery of [the Umbel] is appreciably diminished." 64 Fed. Reg. at 37,445. Moreover, the Umbel's status is so precarious that "any adverse modification of its habitat would be likely to jeopardize the species." *Id.* at 37,449; *see also id.* ("We believe that any project that would adversely modify or destroy critical habitat would also jeopardize the continued existence of the species.").

## II.     Trespass Cattle Threaten the Umbel's Survival and Recovery

48.     Livestock grazing can adversely modify or destroy the Umbel's critical habitat and jeopardize the continued existence of the species. As FWS explained in its Recovery Plan for the Umbel, livestock grazing threatens two of the primary constituent elements of the Umbel's critical habitat—namely element 2, a stable stream channel, and element 3, a stable riparian plant community. As FWS further specified, the Umbel and its habitat are "affected by livestock grazing in the following ways: 1) trampling, 2) direct impacts from construction of range improvement projects, 3) changes in stream geomorphology that lead to erosion, sedimentation, and downcutting, and 4) watershed degradation and resulting adverse effects to stream

16

hydrology." Generally, livestock do not eat the Umbel, but instead trample it while grazing on other nearby plants and cause severe damage to the riparian habitat on which the Umbel depends.

49.     FWS's Recovery Plan further elaborated on the threats to the Umbel and its habitat from livestock grazing:

> If not controlled, grazing during dry periods when cattle spend a disproportionate amount of their time in riparian areas may result in harmful effects to [the Umbel] and other riparian obligates. In such instances, severe and widespread trampling may occur; roots and soil structure can be damaged; vegetation, species composition, and structure can shift; soil can become compacted; stream banks can be degraded; runoff and soil erosion from storm events may increase with higher peak flows; and stream entrenchment may occur; all of which would have harmful effects on [Umbel] habitat and existing occurrences.

50.     FWS's Recovery Plan also includes rigorous evidence proving that "[h]igher intensity grazing of riparian areas has been shown to reduce the occurrence of [the Umbel] and damage its habitat." For example, in one area, "researchers quantified the impacts of a single cow on individual [Umbel] and concluded that even a small number of livestock left in one place could eradicate the taxon in that area."

51.     Livestock grazing can also "accelerate erosion and sedimentation of Umbel habitat," according to FWS's Recovery Plan. "In particular, high levels of livestock can occur during periods of drought when livestock congregate around drying pools that provide water and forage. Livestock can directly trample plants and leave habitat vulnerable to accelerated erosion that degrades future habitat suitability." Accordingly, FWS found that "[i]t is important to work with land managers, le[s]sees, and land owners to remove livestock from such areas at times when adequate water is unavailable to disperse cattle and thus reduce impacts."

52.     Because livestock grazing harms the primary constituent elements of designated critical habitat as described above, trespass cattle adversely modify or destroy the Umbel's designated critical habitat. And because FWS has found that "any adverse modification of its habitat would be likely to jeopardize the species," trespass cattle also jeopardize the Umbel's continued survival.

53.     Trespass cattle also prevent the Umbel's recovery. FWS's "recovery strategy" described in its Recovery Plan for the Umbel "focuses on minimizing or ameliorating the most significant long-term threats to the continued existence of the taxon," which include "aquatic habitat degradation" and "poorly managed livestock grazing." This strategy entails "managing areas where livestock congregate that further stress [the Umbel]."

54.     Likewise, FWS specifies that the "recovery objectives" for the Umbel, which include "action that must be taken to prevent a significant decline in the taxon population/habitat quality or some other significant negative impact short of extinction," require "[r]emov[ing] stressors related to . . . poorly managed livestock grazing." In particular, this objective requires "[p]rotect[ing] occupied habitats from congregating livestock . . . especially during dry periods." This in turn requires "checking and maintaining throughout the range of the taxon: a) pasture and exclosure fences, b) occurrences, especially during the driest times of the year, and c) enforcing trespass cattle removal if necessary." With particular attention to the SPRNCA, FWS has stated that "within . . . exclosures (e.g. see the San Pedro River National Conservation Area . . . ), it is important to monitor and remove trespass livestock."

55.     FWS's Recovery Plan also includes rigorous evidence showing that livestock exclosure fencing can benefit the Umbel, including a study by FWS showing that Umbel "growing outside of cattle exclosures were diminished in size and quantity compared to those plants inside exclosures." FWS's 2014 study examined "areas both inside and outside" an intact cattle exclosure fence. "Inside the exclosure, [the Umbel] occurred in multiple small patches in slow-moving shallow water along a narrow waterway and growing among moss and other semi-aquatic wetland vegetation." However, patches outside the exclosure fence were in comparatively poor condition, such as one area "on the slumping edges of a water-filled mud hole heavily utilized by livestock," where the "plants were small in stature and the patches very sparse, occurring within the hoofprints of cattle, with adjacent cow pies and slumping stream banks." Later that year, scientists revisited the area "following monsoon-related flooding" but found no Umbel surviving where the "mud hole had been filled in with sediment."

56.     FWS's findings also reveal that where exclosure fences "intended to protect [the Umbel]" are allowed to fall into disrepair, "cattle heavily impacted the area, and the only riparian plants found were grasses."

III.     **Trespass Cattle Are Common in the SPRNCA**

57.     Like many western states, Arizona has enacted "fencing out" laws, making clear that landowners—rather than livestock owners—bear the responsibility for protecting lands by erecting fences to exclude free-ranging cattle. As such, Arizona state law generally does not impose any duty on livestock owners to prevent their cattle from ranging onto other lands, whether public or private, and generally creates no liability under state law for cattle that cause damage on another's unfenced, or poorly fenced, lands. *See*, *e.g.*, AZ Rev. Stat. § 3-1427 (2020) ("An owner or occupant of land is not entitled to recover for damage resulting from the trespass of animals unless the land is enclosed within a lawful fence . . . ."). On information and belief, livestock owners near the SPRNCA do not maintain fences sufficient to prevent their cattle from ranging onto nearby public lands, including the SPRNCA.

58.     BLM has not maintained the boundary fence around the SPRNCA in sufficient condition to prevent entry by trespass livestock. Consequently, as BLM has communicated to the Center by email, "unauthorized grazing by livestock has been occurring periodically within the SPRNCA since it was established in 1988." Due to BLM's failure to maintain the boundary fence, it has fallen into severe disrepair.

59.     BLM has previously represented that it would maintain the SPRNCA boundary fence to prevent trespass cattle from harming the SPRNCA and its resources, including the endangered Umbel. For example, in its 1993 "San Pedro Riparian National Conservation Area Habitat Management Plan," BLM stated that it would "actively enforce[]" a restriction on livestock grazing within the SPRNCA "through maintenance of existing fence lines, cooperative agreements with neighboring range users, and trespass detection." Likewise, in 1997, BLM engaged in formal consultation under section 7(a)(2) of the ESA regarding a Livestock Grazing Program that authorized grazing on public lands in southeastern Arizona outside the SPRNCA; the resulting Biological Opinion stated that "to protect the Huachuca Water Umbel," BLM would

"take immediate action to remove trespass cattle from the San Pedro River RNCA as soon as possible, and measures will be implemented, including continuing to construct, inspect, and maintain fences to ensure that trespass does not continue."

60. Nevertheless, trespass cattle have in fact continued to enter the SPRNCA and damage its natural resources, including the Umbel and its critical habitat. For example, the Center notified BLM by email in 1995 that "[t]his year in particular, our members have been increasingly appalled at the level of escalating damage caused by trespass cattle with the NCA. From at least Hereford to Contention, we are observing increasing evidence of cattle use . . . ." And again in 1997, the Center notified BLM by email that its "members continue to complain about damage from trespass cattle on the [SPRNCA]." In 2005, the Center noted in communication to BLM that "illegal trespass cattle are still present throughout the SPRNCA," which "continues to impede full SPRNCA recovery." In 2006, BLM acknowledged in communication to the Center that "unauthorized cattle grazing . . . continues to be an issue" because "[l]ivestock can enter the SPRNCA through boundary fences after the fences are cut by off-highway vehicle owners or destroyed by flooding down the 100 or more side drainages, and by illegal immigrant activities." At that time, BLM claimed that "after livestock have been reported, the BLM reacts as quickly as possible to notify the owners and have them removed." However, BLM did not explain any action it had taken or would take to prevent damage from trespass cattle, apparently abandoning the agency's previous statements that it would construct and maintain fences "to ensure that trespass does not continue."

61. In 2012, the National Riparian Service Team, an interagency team with members from BLM, the United States Forest Service, and the Natural Resources Conservation Service, issued a report on "Riparian Conditions Along the San Pedro River." That report's "key finding" was that "while the BLM made efforts to eliminate trespass livestock in the SPRN[C]A, more needs to be done and State Office support is needed." The report found that "[t]respass livestock is an issue along the river corridor throughout the SPRNCA," and that in certain sections of the river, "it is clearly having some effect on recovery." The interagency team explained that trespass cattle are attracted to the SPRNCA because "[a]t some times of the year, the riparian

20

vegetation growing on the low bars adjacent to the river is essentially the only green forage available thus attracting cows; and water is always an attractant in areas where it is in short supply." The report found that "unmanaged grazing is impacting development of vigorous stabilizing riparian communities where livestock access the streamside area," and that "[u]nauthorized grazing is retarding the recovery of sections of the river, and needs to be eliminated." The report described eliminating trespass livestock as "a high priority" in certain stretches of the river, including some stretches where the Umbel struggles to survive in its designated critical habitat.

62.     In 2017, BLM prepared its own "San Pedro Riparian National Conservation Area Analysis of the Management Situation Report." In that analysis, BLM found that "[t]he riparian portions of the SPRNCA [] are also excluded from grazing year-round by fencing, although sometimes trespass cattle enter through broken fences or watergaps." BLM's analysis claimed that "trespass grazing on the SPRNCA is being addressed through improvements in fencing and monitoring by staff," but also admitted that "complete exclusion of livestock is elusive due to the approximately 200 miles of perimeter fencing that borders the SPRNCA." Consequently, BLM's analysis found that "[t]respass cattle continue to impact riparian vegetation (both native and exotic) within areas of the SPRNCA."

63.     In 2019, BLM issued a new Resource Management Plan ("RMP") for the SPRNCA. As required under section 7(a)(2) of the ESA, BLM engaged in formal consultation with FWS regarding its 2019 RMP. During that formal consultation, BLM acknowledged in drafts of its Biological Assessment that "[t]respass livestock occur in small numbers (<50 head) along the San Pedro and St. David Cienaga" in the SPRNCA, and that trespass cattle adversely affect listed species including the Umbel through the "risk of localized trampling, and discrete areas of habitat damage." BLM also admitted that "control of livestock from adjacent ranches without BLM leases is an ongoing issue, especially on the San Pedro River and St. David Cienaga." BLM conceded that trespass grazing "has an adverse effect on [the Umbel's] habitat including areas designated [as critical habitat]." However, in that same process, BLM made clear that it was "not consulting on to [sic] effects created by trespass livestock from ranches not under

a BLM lease." Likewise disregarding the impact from trespass cattle, BLM's final Biological Assessment for the 2019 RMP ignored how trespass livestock harms the Umbel, instead claiming that "[l]ivestock grazing would not be authorized in Huachuca water-umbel habitat; therefore, there would be no direct impacts, such as trampling or herbivory."[1]

64.     During formal consultation over BLM's 2019 RMP for the SPRNCA, FWS also described how trespass cattle harm the Umbel and its critical habitat. However, because BLM chose to consult FWS only on the effect on the Umbel from its four authorized grazing allotment permits and not on SPRNCA general management, FWS did not have an opportunity to make formal findings as to whether trespass cattle adversely modify or destroy critical habitat or jeopardize the continued existence of the Umbel. However, FWS's Biological Opinion nonetheless did find that "livestock grazing is likely to adversely affect Huachuca water umbel both directly (e.g. potential trampling by trespass cattle) and indirectly (e.g., changes to habitat from water use and livestock grazing in the uplands)."

65.     FWS also submitted comments on BLM's draft 2019 RMP, which originally proposed an expansion of livestock grazing throughout much of the SPRNCA—a proposal to which FWS strenuously objected. Among other concerns, including that livestock grazing is not consistent with the purposes for which Congress created the SPRNCA and thus violates BLM's statutory mandate, FWS found that "adverse effects to riparian and wetland habitat" would occur "from trespass cattle not under BLM lease." FWS also expressed that "[t]rampling, removal of regenerating tree seedlings, and overgrazing of riparian and wetland plants is likely to occur."

66.     In 2019, FWS also stressed the need for increased attention to monitoring and maintenance of fences to exclude cattle from the SPRNCA. For example, FWS stated that "[i]nspecting fences frequently would be needed to ensure that all blowouts, breaks, or cuts are repaired so that livestock cannot enter riparian habitat," and that "[i]f funding and personnel are inadequate to regularly inspect and fix the fence, adverse effects to habitat and listed species are

---

[1] A challenge to BLM's 2019 RMP and the associated formal ESA consultation is pending in this Court. *See Western Watersheds Proj., et. al. v. Feldhausen, et al.*, No. CV-20-0149-TUC-JGZ. Although the two cases are related, as both concern the SPRNCA, this case raises distinct claims and involves a different set of plaintiffs.

likely to increase." FWS further noted that "a break that is not discovered or fixed for one month could result in trespass cattle removing a season's worth of riparian tree generation."

67.    In the last two years alone, the Center and its members have filed 17 complaints with Arizona State Director Suazo and SPRNCA Manager Feldhausen regarding trespass cattle and fencing needing maintenance. These complaints were filed on the following dates: May 9, 2020; May 10, 2020; June 16, 2020; October 6, 2020; March 21, 2021; March 22, 2021; April 2, 2021; April 6, 2021; April 19, 2021 (two complaints); April 22, 2021; May 15, 2021; June 6, 2021; July 9, 2021; September 5, 2021; and September 25, 2021 (two complaints).

68.    On information and belief, BLM has not sought civil or criminal penalties as a consequence for trespass grazing on the SPRNCA. On information and belief, BLM has not utilized its authorities to seek to recover damages from the owners of trespass livestock in compensation for the harms caused to the Umbel or its critical habitat. On information and belief, despite the fact that trespass grazing has been a recurring problem on the SPRNCA, BLM has not utilized its authorities to classify trespass grazing as "willful" or "repeated willful" or sought to recover from trespass grazers the appropriate damages associated with such classifications. On information and belief, BLM has not enforced the legislation creating the SPRNCA by seeking civil or criminal penalties based on unlawful entry into the SPRNCA by trespass cattle.

**IV.    Trespass Cattle Harm the Heart of the Umbel's Occupied Critical Habitat**

69.    The area within SPRNCA north of the Hereford Bridge has historically supported the largest and highest concentration of endangered Huachuca Water Umbel. This is illustrated in the following map, Figure 2, from the last comprehensive Umbel survey,[2] with labels for "Highway 90" and "Hereford Bridge" added by the Center for clarity:

---

[2] 2015 HUACHUCA WATER UMBEL (*Lilaeopsis schaffneriana* ssp. *recurva*) SAN PEDRO RIPARIAN NATIONAL CONSERVATION AREA INVENTORY REPORT, COCHISE COUNTY, ARIZONA, Environmental and Natural Resources Division Directorate of Public Works, U.S. Army Garrison, Fort Huachuca, Arizona, Prepared by: XCEL Engineering, Inc, Oak Ridge, TN 37830, March 2016.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



Figure 2.   2015 Inventory Results of *Lilaeopsis schaffneriana recurva* on the SPRNCA

70.     The following photograph, taken by a member of the Center in June 2021, documents the San Pedro River without cattle grazing, and thus depicts what the Umbel's critical habitat should look like in the absence of damage from trespass cattle:



71.     In sharp contrast, the following representative images, taken by a member of the Center on June 17, 2021, illustrate conditions in the SPRNCA between the Hereford Bridge and Highway 90, which is an area of occupied designated critical habitat and is the area where the latest survey previously found the largest and highest concentration of the endangered Umbel.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28





72.     On June 17, 2021 and June 28, 2021, members of the Center searched for the Umbel between the Hereford Bridge and Highway 90 in the area where the last surveys previously found the largest and highest concentration of the endangered Umbel. However, the members of the Center found only two Umbel metapopulations or occurrences.

73.     On September 14, 2021, members of the Center surveyed the status of the boundary fencing around the SPRNCA, which is supposed to be maintained by BLM to protect the endangered Huachuca Water Umbel, its designated critical habitat, and the San Pedro River. BLM's failure to maintain the boundary fence is particularly serious given the fact that this stretch of the San Pedro River between the Hereford Bridge and Highway 90 is the area where the last surveys previously found the largest and highest concentration of endangered Umbel. The following representative images from September 14, 2021, illustrate the fact that BLM continues to fail in its duty to maintain the boundary fencing essential to protect the endangered Huachuca Water Umbel, its designated critical habitat, and the San Pedro River. Additional photographs of the ineffective boundary fence are attached to this Complaint.



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28






1
2
3
4
5
6
7
8
9
10
11
12
13




14
15
16
17
18
19
20
21
22
23



24    74.    On September 25, 2021, the Center sent these photographs of the dilapidated

25  boundary fence to BLM by email, with detailed information about the location where each

26  photograph was taken. On September 30, 2021, BLM responded by email indicating that the

27  agency may work with permittees or adjacent landowners on repairs to these particular locations.

28  However, BLM's email did not provide any time frame for its efforts, let alone suggest that BLM

would undertake a comprehensive program to conserve the Umbel (or any other ESA-listed species) by preventing harms from trespass cattle in the SPRNCA.

**V.      Plaintiffs' Notice of Intent to Sue**

75.      In compliance with the ESA's requirement for citizen suits, 16 U.S.C. § 1540(g)(2), Plaintiffs submitted to Defendants a sixty-day notice of intent to sue on July 9, 2021. Plaintiffs' notice letter specifically informed Defendants that they had violated and are in ongoing violation of the ESA in connection with their "failure to (1) maintain the required boundary fences protecting the San Pedro Riparian National Conservation Area ("SPRNCA") and (2) [their] failure to remove unauthorized trespass cattle in SPRNCA that are jeopardizing the continuing existence of an Endangered Species, Huachuca Water Umbel, [and] destroying its designated SPRNCA Critical Habitat." Likewise, Plaintiffs' notice letter explained that "[b]y chronically failing to take action in response to repeated complaints of trespass cattle in habitat— including occupied critical habitat—for the federally protected species identified herein, and especially BLM's failure to construct and/or maintain fencing to keep trespass cattle out of SPRNCA, BLM is in ongoing violation of Section 7(a)(1) of the ESA." A copy of Plaintiffs' notice letter is attached to this Complaint.

76.      Plaintiffs' photographs of damage from trespass cattle, which were included in Plaintiffs' notice letter, vividly illustrate precisely the types of destruction that FWS has explained "have harmful effects on [Umbel] habitat and existing occurrences," such as trampling, damage to soil structure and riparian plants, degradation of stream banks, and erosion and runoff. Accordingly, Plaintiffs' photographs document how trespass cattle have caused harm to the primary constituent elements of the Umbel's critical habitat, namely element 2, a stable stream channel, and element 3, a stable riparian plant community, and have thus destroyed or adversely modified the Umbel's habitat and jeopardized the continued existence of the species, in direct contravention of the ESA's obligation to conserve the Umbel.

77.      Plaintiffs' notice letter also informed Defendants of the dire situation facing the Umbel in areas recently damaged by trespass cattle, including the stretch of the river north of the Hereford Bridge in the SPRNCA. The notice letter explains that this area featured "the heaviest

concentration" of Umbel in the SPRNCA, according to the latest survey, but also describes how since that time the area "has dried significantly with little remaining surface water and dramatically less Umbel." The notice letter also describes Plaintiffs' effort to locate the Umbel in the stretch of the river between the Hereford Bridge and Highway 90, which is a stretch of the river where the interagency National Riparian Service Team stressed in 2012 that removal of trespass cattle is "a high priority," but where Plaintiffs have documented the recent presence of trespass cattle. Plaintiffs reported finding only two occurrences of the Umbel in this area, including one occurrence where "[c]attle tracks were found within feet" of the Umbel. Plaintiffs' notice letter also documented how "[c]attle sign and damage" extend throughout this core area of designated critical habitat.

78.     Plaintiffs' notice letter informed Defendants that by damaging the primary constituent elements of the Umbel's habitat, trespass cattle in the SPRNCA have caused and on information and belief are continuing to cause destruction or adverse modification of the Umbel's critical habitat as well as jeopardy to the continued existence of the species. Plaintiffs' notice letter stressed that by failing to address these serious threats to the Umbel and its critical habitat by utilizing its authorities to protect and conserve the species, BLM is in ongoing violation of the ESA.

79.     Plaintiffs' notice letter also stressed that BLM has a duty under section 7(a)(1) to develop, in consultation with FWS, a program for the conservation of the Umbel that utilizes BLM's authorities, including its authorities as manager of the SPRNCA.

80.     On information and belief, BLM has not developed any program for the conservation of this species (or any other endangered or threatened species that relies upon habitat in the SPRNCA) in consultation with FWS under section 7(a)(1) of the ESA.

81.     After filing this lawsuit, Plaintiffs received a response from BLM regarding Plaintiffs' notice letter. Although BLM's two-page response was dated September 2, 2021, Plaintiffs did not receive the agency's response until October 22, 2021. Notably, BLM's response did not even mention the Umbel and made no effort to dispute the key factual points detailed in Plaintiffs' extensive notice letter, including the fact that trespass cattle have heavily

damaged the heart of the Umbel's occupied critical habitat, where Umbel populations are in dramatic decline. Instead, BLM failed to identify any specific programs to conserve the Umbel and attempted to disclaim responsibility under the ESA for protecting or conserving the species. To that end, BLM claimed that because the agency does not authorize grazing outside four allotments in the SPRNCA, any trespass grazing "is not a federal action under section 7, and as such, no violation of section 7 has occurred."

82.     BLM's response also described "ongoing management actions" regarding trespass livestock. Thus, BLM claimed that it attempts to identify trespass cattle, determine the owner, "and then have the livestock removed by the owner." However, BLM neither provided any specific information about how often trespass grazing occurs, how much damage trespass grazing causes the Umbel or other environmental resources in the SPRNCA, or whether the agency's approach to trespass grazing is even remotely effective at preventing or correcting such harms. Likewise, BLM's statement that it merely makes an "attempt" to "have the livestock removed by the owner" fails to explain whether BLM actually utilizes the authorities available to the agency—such as removing trespass livestock itself or seeking compensation for environmental damage from the owners of trespass livestock. BLM also claimed that it "recently ordered 90 miles of fencing materials to address areas of concern and will be working to improve maintenance of boundary fences." However, BLM's response did not identify what "areas of concern" the agency intends to address or whether action in such areas would eliminate or significantly reduce harms to the Umbel from trespass cattle. Moreover, BLM has failed to follow through on similar prior assurances. For example, a 1997 Biological Opinion stated that BLM would "construct, inspect, and maintain fences to ensure that trespass does not continue," yet trespass grazing has in fact continued to occur regularly in the SPRNCA, harming the Umbel, degrading its habitat, and leaving the species in the extremely precarious situation it faces today.

## PLAINTIFFS' CLAIMS FOR RELIEF

### Claim I – Violations of Section 7(a)(1) of the ESA

83.     Plaintiffs hereby incorporate all preceding paragraphs by reference.

84. By failing to utilize its authorities under federal law, including its authority as the manager of the SPRNCA, to conserve the endangered Huachuca water umbel and its designated critical habitat, including by preventing damage to the species and its habitat by constructing and/or maintaining a boundary fence around the SPRNCA sufficient to prevent trespass cattle from entering into the Umbel's critical habitat and damaging the species and its habitat, BLM is in ongoing violation of its affirmative duty under section 7(a)(1) of the ESA to utilize its authorities to carry out an essential program for the conservation of this endangered species.

85. By failing to utilize its authorities under federal law, including its authority as the manager of the SPRNCA, to conserve the Umbel by protecting the species and its habitat from trespass cattle, including by promptly removing all trespass cattle from the Umbel's critical habitat and deterring livestock owners from allowing their livestock to enter into the Umbel's critical habitat through the maintenance of boundary fences that is necessary as a practical matter in a "fence out" State, or through the use of the agency's authorities to seek compensation for damages to federal property, including the Umbel and its designated critical habitat, BLM is in ongoing violation of its duty under section 7(a)(1) of the ESA to carry out programs for the conservation of this endangered species.

86. By failing to develop, in consultation with FWS, a section 7(a)(1) program that identifies and utilizes BLM's authorities for the conservation of the Umbel, including protecting the species from significant and chronic threat posed by trespass cattle, despite the fact that the largest remaining populations of the species and the majority of its critical habitat occur in the BLM-managed SPRNCA, BLM is in ongoing violation of its duty under section 7(a)(1) to develop and implement programs for the conservation of this endangered species.

**Claim II – Violations of the ESA and the Administrative Procedure Act**

87. Plaintiffs hereby incorporate all preceding paragraphs by reference.

88. Although the ESA's citizen suit provision "is a means by which private parties may enforce the substantive provisions of the ESA against regulated parties—both private entities and Government agencies," *Bennett v. Spear*, 520 U.S. 154, 173 (1997), some "courts have found [that a claim under section 7(a)(1) of the ESA] is properly brought under the

[Administrative Procedure Act ("APA")], which imposes on agencies a general duty of timeliness in carrying out a required action," *Defenders of Wildlife v. U.S. Fish & Wildlife Serv.*, 797 F. Supp. 2d 949, 952 (D. Ariz. 2011); *see also* 5 U.S.C. § 706(1) ("The reviewing court shall . . . compel agency action unlawfully withheld or unreasonably delayed.").

89.     In the alternative, Plaintiffs claim that each of the violations of the ESA described under Claim I in paragraphs 83–86 also constitute agency action unlawfully withheld and unreasonably delayed under section 706(1) of the APA.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter an Order:

1.     Declaring that Defendants have violated and are in ongoing violation of the Endangered Species Act and/or the Administrative Procedure Act;

2.     Ordering Defendants to come into compliance with section 7(a)(1) of the Endangered Species Act and/or the Administrative Procedure Act by developing and implementing, by a date certain set by the Court, a program for the conservation of the endangered Huachuca water umbel that utilizes BLM's authorities under federal law, including its authority as manager of the SPRNCA, and that specifically conserves the Umbel by protecting it against the serious threat posed by trespass cattle and BLM's failure to provide for and maintain essential boundary fencing;

3.     Awarding Plaintiffs their attorneys' fees and costs in this action; and

4.     Granting Plaintiffs any further relief as the Court may deem just and proper.


Respectfully submitted,

/s/ William N. Lawton

William N. Lawton
Eubanks & Associates, PLLC
1331 H Street NW, Suite 902
Washington, D.C. 20005
DC Bar No. 1046604
(admitted *pro hac vice* motion)
nick@eubankslegal.com

(202) 556-1243

William S. Eubanks II
Eubanks & Associates, PLLC
1331 H Street NW, Suite 902
Washington, D.C. 20005
DC Bar No. 987036
(admitted *pro hac vice* motion)
bill@eubankslegal.com
(970) 703-6060

Counsel for Plaintiffs